Welch, J.
The trouble in construing Bailey’s contract with the company arises from the fact that the contingency which afterward happened, an expiration of the charter, and the consequent abandonment of the work, was not contemplated by the parties. No word in the contract looks to such an event. All its provisions are based upon the supposition that the work would all be performed; that however unprofitable the investment might prove, however worthless its bonds and stocks, the road would be finished and equipped. In such a case we must determine as best we can, from what the parties have said, and in the light of the circumstances that surrounded them, what they reasonably would have saidhadthis contingency been in their minds. I know of no other or better rule. Now, tried by this rule, will the contract in question bear the construction put upon it by the district court? In the light of 218] what the parties have said, *and of their surroundings, is it reasonable to suppose that they intended, or that if they had foreseen the contingency which happened, they would have provided that if the work should only progress far enough to use up the cash assets of the company, the $250,000, the contractor should have double pay for what ho did ? — that the company should not only bear the whole loss, but should be subjected to a large additional loss, in the shape of exorbitant profits to the contractor? As just and reasonable men they could not have so intended or provided, and if their contract will boar an interpretation which makes them just and reasonable, we are bound to give it that interpretation. The parties evidently contemplated the possibility, or rather the probabibility, of tho bonds and stock becoming greatly depreciated below their par value, and perhaps of the latter, like the stock of most roads, being utterly valueless. This is the only assignable reason why two prices were allowed for the work. The work was probably estimated to be worth some $800,000, instead of $1,600,000 ; and the $1,250,000 of stock and bonds were probably considered of the value of about $550,000, making with the $250,000 cash assets, the sum of $800,000. The price agreed to be *219 paid was nominal. The estimates, based as they were upon the sum of $1,600,000, were nominal estimates, and if paid wholly in cash assets, were, to the extent of their value over and above what it would have been if paid pro rata in the articles stipulated, advances, to be adjusted at the end of the work. Ordinarily “estimates ” are resorted to as a mere expedient for determining the rapidity with which advances or payments are to be made, and their necessity is found in the fact that the contractor is unable to complete the work without them. They are not paid as the absolute prices of the work done, but are, as the name indicates, mere approximations to its value, and subject to a final adjustment when the work is completed. Usually a percentage on the current estimates is left in the hands of the employer, to be accounted for upon the final settlement. At the end of the work a “final ” estimate is made, which, as I understand the terms, is not only “ final ” in point of time, hut final because it re-estimates the entire work, superseding all intermediate estimates, *and finally fixing the rights [219 of the parties. Upon this final estimate and settlement all overestimates and overpayments, as well as underestimates and underpayments, are to be considered and accounted for by the parties. The contract in this case reserves no part of the estimates in the hands of the company,-but in effect-, as we understand it, provides for the payment of overestimates at the option of Bailey. It is as though the contract had said: “Provided, however,'that said Bailey shall have the right, if he finds it necessary in order to the completion of the work, to demand and receive double estimates upon his work, to any extent not exceeding $250,000, in which case subsequent estimates shall be diminished, so as to compensate for the overpayments.” If the contract had read thus, there could be no doubt as to its true construction. To read it otherwise would be to hold that the parties meant to put it in the power of Bailey, nay, to make it his interest, to defeat the apparent object of both, by using his influence and the power which ho would acquire as contractor, not to procure an extension of the charter, or to effect a completion of the road, but to realize a largo profit from a forfeiture of the charter, and abandonment of the road. If they wore reasonable and honest men, as we are bound to consider them, they could never have so intended.
We think, therefore, that these current estimates and payments are not to be regarded as final between the parties, but that they *220 are subject to a future and final account, upon just and equitable principles. What those principles are seems to us quite evident. The contract provides, among other things, that Bailey shall not be compelled to advance the work faster than the conversion of the funds into means for the purpose will enable him to do. It seems to us that there are in this provision, in common with other features of the contract, two undeniable implications: 1. That Bailey, during the progress of the work, should not be compelled to invest in it any of Ms private means, thus subjecting him to loss; and, 2. That he should apply all the means furnished him to the construction and equipment of the road, and not withdraw any part thereof, in the shape of profits or otherwise, so long as those means did not 220] exceed the necessary ^amount to carry on and complete the work. If we are right in this construction, it follows that Bailey should be required to account to the company for actual profits realized upon the work, and for no more. On the one hand, it would be unjust to him that he should be compelled to refund twelve hundred and fifty sixteen-hundredths of all the valuable assets received, and take worthless bonds and stock instead; and on the other hand it seems to us it would be equally unjust to the company to throw upon it, in addition to the loss of the whole work, the loss of large profits to the other party. Neither party seems to have been at fault, and Bailey ought to be satisfied if he escapes from the unfortunate enterprise without actual loss.
We differ with the district court also as to the question raised between the company and the stock subscribers. Upon the case made in the bill of exceptions we think they should have been held liable on their new notes. No fraud is shown in the representations made to them. Nothing appears in the evidence to distinguish their case from the ordinary case of subscriptions to the stock of a railroad company, made in the honest but erroneous belief that the road would be completed, and be a wise investment. In all such cases public policy, as well as good faith to the creditors and other stockholders of the company, requires that they should be held to the fulfillment of their undertakings.
We are of opinion, therefore, that the finding of the district court on both issues was contrary to the law and evidence of the case, and that the court erred in overruling the motion for a new trial.
The judgment will therefore be reversed, and the case remanded for a new trial and further proceedings.
Day, C. J., and Brinkerhoff, Scott, and White, JJ., concurred.